[Cite as *In re C.K.*, 2016-Ohio-8002.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re C.K., C.S.

Court of Appeals Nos. L-16-1081
L-16-1085

Trial Court No. JC 13234852

**DECISION AND JUDGMENT**

Decided: December 2, 2016

* * * * *

Laurel A. Kendall, for appellant father, M.S.

Tim A. Dugan, for appellant mother, T.K.

Angela Y. Russell, for appellee.

* * * * *

**OSOWIK, J.**

{¶ 1} This is a consolidated appeal from a judgment of the Lucas County Court of

Common Pleas, Juvenile Division, that terminated the parental rights of appellant mother

and appellant father and granted custody of their minor children C.K. and C.S. to appellee

Lucas County Children Services ("the agency"). For the following reasons, the judgment of the trial court is affirmed.

{¶ 2} Appellants T.K. ("mother") and M.S. ("father") are the biological parents of C.K. and C.S. The record reflects that both parents have had extensive involvement with child protective services in both Summit County, Ohio, and Lucas County, Ohio, with regard to C.K., born in April 2008, and C.S, born in November 2010. While the relevant dates are unclear, it appears that appellant mother lived in Summit County for a few years from approximately 2009 until 2014. C.K. was removed from the home in 2009, found to be dependent and placed in the legal custody of relatives. When the relative placement disrupted in 2011, C.K. was returned to her mother. C.S. was removed from mother's custody after her birth in 2010, found to be dependent and placed in the temporary custody of Summit County Children Services. Legal custody was returned to mother upon the completion of case plan services in August 2011 with protective supervision to Summit County. Summit County's protective supervision was terminated in November 2011 with father to have supervised visitation. In April 2012, however, mother sent the children to visit father and father kept them, subsequently filing for custody. Father's supervised visits became "as the parties agreed" in August 2012 and legal custody was awarded to father in January 2013.

{¶ 3} LCCS became involved with the family in August 2013, when it received temporary emergency custody of C.K., then five years old, and C.S., then two years old, for purposes of shelter care. At that time, C.S. was admitted to the hospital, where she

2.

presented as lethargic and barely eating, with a large bruise on her temple and a dark bruise to one eye. Further examination disclosed two brain bleeds, a skull fracture and a contusion on her shoulder. It was unknown who inflicted the injuries, although the children later stated that father was responsible. The siblings were placed in foster care and on September 24, 2013, an original case plan was filed to aid in reunification. On January 14, 2014, an adjudication hearing was held. C.K. was found to be dependent and C.S. was found to be dependent and abused. Temporary custody of both children was awarded to the agency. Case plan services were offered to the parents with the goal of reunification.

{¶ 4} On August 13, 2014, LCCS filed a motion for permanent custody. LCCS alleged that reasonable efforts were made to prevent removal and reunify the family and that it would be in the best interest of the children to permanently terminate parental rights.

{¶ 5} It should be noted that on January 15, 2015, appellant father was indicted on two counts of endangering children and one count of making a terroristic threat which arose from threats made to several LCCS employees during 2014. (Case No. CR0201501080). The charges of endangering children arose from the serious injuries suffered by C.S. in August 2013. On May 12, 2015, father entered pleas of guilty pursuant to *North Carolina v. Alford*, 394 U.S. 956, 89 S.Ct. 1306, 22 L.Ed.3d 558 (1969), to one offense of endangering children in violation of R.C. 2919.22(B)(3), a third-degree felony, and one count of making a terroristic threat in violation of R.C.

3.

2909.23(A)(1)(c), a third-degree felony. Father was sentenced to a term of 24 months for the conviction of endangering children and 12 months for the conviction of making a terroristic threat. The sentences were ordered served consecutively.

{¶ 6} Nine hearings on the permanent custody motion were held between March 5 and September 16, 2015. Both parents appeared, mother with counsel and father pro se with legal consultant. At the time of the hearing, father was serving his sentence of 36 months for the aforementioned convictions.

{¶ 7} The agency's first witness was Janis Woodworth, a licensed psychologist and clinical director at Harbor Behavioral Healthcare. Woodworth completed a psychological evaluation of father in March or April 2014 after a referral by LCCS. Woodworth testified that father's legal history included domestic violence incidents as a child, legal problems connected with stolen property, incarceration as recently as 2009 and multiple arrests related to failure to pay child support. Father was diagnosed with a personality disorder, not otherwise specified, and a global assessment of functioning score of 58, which constitutes moderate to severe impairment. She testified that father acknowledged engaging in intimidating behavior when, in his words, he does not get his own way. She did not recommend unsupervised visits due to unresolved allegations of sexual abuse and physical abuse with regard to at least one of father's children. Woodworth recommended counseling for father to address abuse and his chronic difficulty interacting with his environment. She concluded that father did not seem to accept responsibility for his own role in keeping his children safe.

4.

**{¶ 8}** Fidel Martinez, an assessment caseworker with LCCS, testified as to his contact with father in April 2014 after a referral alleging that father struck and injured a 13-year-old child. Martinez stated that appellant acknowledged having a verbal disagreement with the child, and told Martinez that "children need to get their ass beat, but CSB doesn't allow parents to touch their kids anymore."

**{¶ 9}** The agency then called appellant mother as if on cross-examination. Mother testified that she currently resided in Summit County and that C.K. and C.S. were in the temporary custody of LCCS. Mother acknowledged involvement with Summit County due to hospitalizations for mental health issues in 2008. C.K., then 11 months old, was removed from her care in March 2009 and placed in the temporary custody of Summit County Children Services. C.K. thereafter was placed in the custody of mother's aunt and uncle and mother regained custody in August 2011. Mother acknowledged that shortly after C.S. was born in December 2010, she attempted to have the child adopted by a woman who was not approved by Summit County. In February 2011, C.S. was removed from mother's custody, adjudicated a dependent child, and placed in foster care. In July 2011, mother received legal custody of C.S. with protective supervision with Summit County.

**{¶ 10}** In November 2011, father was granted supervised visits with the children. Mother further testified that in January 2012, after Summit County terminated its involvement, she sent both children to Lucas County to visit their father with the understanding they would be returned to her in April. Mother testified, however, that

5.

father refused to return the children and that custody was given to father in January 2013. Mother acknowledged that C.K. had lived with her for only about a year since her birth in 2008 and C.S. for only about six months since her birth in 2010.

{¶ 11} Mother testified that she visited the children in Lucas County at father's home and said she disagreed with his level of discipline. She described one incident when father smacked C.K. on the mouth and another when father held C.S. against a wall and put his finger in her mouth to keep her from crying after her diaper leaked on her clothing and the couch. Mother stated that despite her knowledge of those incidents, she did not file a motion for a change of custody.

{¶ 12} Mother further testified as to her original case plan with a goal of reunification with services for domestic violence, mental health and parenting. She acknowledged having received mental health services for depression, anxiety and bipolar disorder for at least as long as both children have been alive. Mother also testified that she attempted suicide several times when she was told the goal of the case plan would be changed to permanent custody. She further admitted having not seen her counselor on a consistent basis prior to the agency's involvement and that since August 2014, she had seen her new counselor only three times. Mother admitted that although the agency paid for bus tickets from Summit County to visit her children twice a month in Toledo, she visited sporadically. She further testified that she had experienced verbal and emotional violence from father but said she sent the children to live with him despite his behavior because she did not believe he would treat the children in the same way.

6.

{¶ 13} LCCS caseworker Deborah Wedding testified as to her involvement with this family. Wedding stated that the children were removed from the home in August 2013 after C.S. suffered her head injury. It was Wedding's belief that father was responsible for the injuries to C.S. based on statements made by the children during home visits. At one point C.S. stated that her daddy hurt her and gave her a black eye. Wedding also referred to father's indictment in January 2015 on felony endangerment charges based on C.S.'s injuries.

{¶ 14} As to the case plan developed for the parents, Wedding testified that initially the agency intended the children to be placed in the legal custody of mother in Summit County and so did not offer services. However, the agency changed its position when it received a home study from Summit County pertaining to mother that indicated concerns regarding mother's mental health, lack of family support and inability to handle father. In January 2014, a case plan with a goal of reunification was implemented for both parents.

{¶ 15} As to mother, services offered consisted of domestic violence classes, parenting and counseling, with an emphasis on maintaining stable housing. Mother's progress in the domestic violence services was "slow" and she did not complete the program. Mother was also referred to an empowerment program in October 2014 which should have been completed by the following December. Mother had not completed it by the beginning of trial in March 2015. Wedding believed mother had not stabilized her mental health sufficiently to care for the children and that she had not successfully

7.

completed that aspect of the case plan. As for parenting classes, Wedding testified that a referral was not made due to the agency changing the case plan goal to permanent custody. Visitation was made available to mother on a weekly basis and the agency paid for two bus tickets from Summit County per month for mother to visit with the children. As of the beginning of trial in March 2015, mother had been offered approximately 75 visits; she missed 42. Wedding further expressed concerns about mother's ability to recognize risks affecting the children when with father, her failure to adequately address her mental health, and an inability to problem solve. Wedding's biggest concern was mother's failure to complete the domestic violence program, which Wedding believed was necessary based on domestic violence incidents between the parents. She stated that the agency believed father was a risk to the children's safety.

{¶ 16} As to father, Wedding testified that the agency had identified services for him despite a case plan not being filed at that time. The agency recommended domestic violence, anger management and parenting programs. It also recommended a psychological evaluation and stable housing. Father completed a diagnostic and substance abuse assessment in November 2013, which diagnosed alcohol dependence and cannabis use in remission. Father did not comply with a recommended drug education program or with requested urine screens. Father was resistant to completing domestic violence services and an anger management course. Wedding testified that between January and February 2014, six incident reports were filed with the agency accusing father of menacing and making verbal threats toward employees. Additionally, Wedding

8.

described father as an aggressive man who liked to threaten and intimidate others. She added that the only barrier she saw to father completing his case plan services was his disagreement with the case plan.

{¶ 17} Wedding testified that C.K. and C.S. were placed together and had been in three foster homes since August 2013. One placement was disrupted due to father's issues and a concern that he might remove the children after he indicated he knew the location. The second placement was disrupted at the foster parent's insistence when C.K. told the foster parent that she would tell her parents where she was. The agency had investigated placement with father's sister, K.S., but Wedding stated that the agency ultimately did not feel that the children would be safe with their aunt who, among other things, had been convicted of disorderly conduct while intoxicated in March 2014. Further, the agency also learned about a number of 911 calls originating from the relative's home involving domestic violence and a lack of supervision of children.

{¶ 18} Todd Spotts, manager of the agency's family services department, testified that he believed father had been given sufficient time in which to complete his case plan services. He further stated that upon father's request, father had been assigned a new caseworker in the fall of 2013, which was not commonly done at the agency.

{¶ 19} Laura Neal, the family's original case supervisor, testified that the agency ultimately decided against legal custody to father's sister due to a lack of honesty when she was investigated and concerns about a prior relationship that had involved domestic violence. Neal believed that permanent custody was in the children's best interest and

9.

testified that mother had not visited with the children on a regular and consistent basis and had indicated that at times father was violent and aggressive toward her. Neal did not see a strong bond between mother and the children. Neal further testified that father had not participated in domestic violence services.

{¶ 20} Dean Sparks, executive director of LCCS, testified that he had signed a "no trespassing" order in December 2014 due to threats the agency believed were made by father toward four agency employees. Sparks further testified that at one point father handed him a note showing the current foster parent's license plate number.

{¶ 21} Father testified that the agency provided him with options as to where he could participate in various services but said he was resistant to what he described as "control." Father acknowledged that his case plan required a domestic violence course and said he was "halfway through." He also acknowledged completing a diagnostic assessment but said he did not follow through because he "didn't agree with the lady's method of madness." He also admitted signing a release of information form for the agency and then revoking it.

{¶ 22} The children's current guardian ad litem testified that she believed it would be in the children's best interest to grant permanent custody to the agency. She expressed concerns about the length at which father would go to regain custody of his children and about mother's mental health, her ability to have the children for an extended period of time without external support, and her susceptibility to father's manipulations. The guardian further noted that neither parent had completed case plan services and that the

10.

services in which they did participate were considerably below the standards normally required of the agency in case plans. She stated that the children, who had been in three foster placements since the case opened, display fairly wide-ranging moods and behaviors requiring patience and consistency. She concluded that neither parent has put the needs of the children ahead of his or her own needs or behaviors and in fact tended to cut themselves off from C.S. and C.K.

{¶ 23} The record reflects that the children's second guardian, who did not testify, stated in her report to the trial court, dated December 19, 2014, that father's sister, K.S., testified at an earlier hearing when questioned about possibly gaining custody of the children that she was no longer in a relationship with a man who was currently incarcerated. However, the guardian stated that in audio jailhouse tapes of a phone call between K.S. and that individual, K.S. was heard saying that she lied while on the stand. Other audiotapes revealed K.S. stating that if she gained legal custody of C.K. and C.S. she would return them to their father. The guardian also stated that C.K., then six years old, repeatedly said that she had to know where she lives so she could tell her father when he asks her.

{¶ 24} On April 5, 2016, the trial court awarded permanent custody of both children to LCCS. Both parents have appealed, filing separate briefs.

**{¶ 25}** Father sets forth the following assignments of error:

I. The trial court erred by finding that Lucas County Children Services had made reasonable efforts to reunify the family when case plan services were refused to father in violation of R.C. 2151.412.

II. The trial court erred when it found there were no relatives able to take legal custody of the children herein when father's sister was willing, and had filed a motion for third party custody of the children.

III. The trial court erred when it granted permanent custody of the children herein to Lucas County Children Services when the children had not been in the custody of the agency for twelve of the previous twenty-two months and reasonable efforts were required.

**{¶ 26}** Mother sets forth the following three assignments of error:

1) The Juvenile Court erred in failing to determine if LCCS's efforts were reasonable.

2) LCCS failed to make reasonable efforts to reunite the children with Appellant.

3) The Trial Court's decision to terminate Appellant's parental rights was not supported by clear and convincing evidence.

**{¶ 27}** Both appellants set forth arguments relating to whether the agency made reasonable efforts to prevent continued removal of the children from the home. Mother

also asserts that the trial court failed to determine whether the agency's efforts to reunify were reasonable.

{¶ 28} The Ohio Supreme Court has held that the reasonable-efforts requirement found in R.C. 2151.419(A)(1) does not apply in a hearing on a motion for permanent custody filed pursuant to R.C. 2151.413 as in this case. *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 41. By its terms, the reasonable-efforts statute applies only to adjudicatory, emergency, detention and temporary-disposition hearings for abused, neglected or dependent children, all of which occur prior to a decision transferring permanent custody to the state. The statute makes no reference to a hearing on a motion for permanent custody. *Id.* As to mother's argument that the trial court failed to make a finding as to the reasonable efforts of the agency, to the extent the trial court relies on R.C. 2151.414(E)(1) at a permanency hearing, the court must examine the "reasonable case planning and diligent efforts by the agency to assist the parents" pursuant to R.C. 2151.414(E)(1). However, R.C. 2151.414 does not mandate that the court make a determination as to whether reasonable efforts have been made in every R.C. 2151.414 motion for permanent custody. *Id.* at ¶ 42. Finally, the record clearly reflects that the agency established that it had made reasonable efforts to prevent the removal of C.K. and C.S. from the home at the shelter care hearing held August 27, 2013, and at the March 6, 2014 disposition hearing after which the agency was awarded temporary custody.

13.

{¶ 29} Father also argues that the trial court erred in finding that the agency had made reasonable efforts to reunify the family when case plan services were refused to father in violation of R.C. 2151.212. Caseworker Wedding testified that initially there were no services offered by LCCS because the goal was for the children to return to mother, who was then living in Summit County. However, once legal custody to mother proved to be inadvisable due to concerns expressed by a Summit County Children Services home study, LCCS recommended temporary custody to the agency and, in January 2014, implemented case plans for both parents with a goal of reunification. Father was referred to domestic violence batterer's treatment at one of two approved programs but started a service through a program that was not approved. He also was referred to anger management and parenting services as well as a psychological evaluation, and was to obtain stable housing. Wedding testified that father was not in agreement with his case plan, which created a barrier to success.

{¶ 30} Based on the foregoing, as well as on the evidence before the trial court as summarized above, appellant father's assignment of error No. 1 and appellant mother's assignments of error Nos. 1 and 2 are not well-taken.

{¶ 31} Father asserts in his second assignment of error that the trial court erred when it found there were no relatives able to take custody because his sister K.S. was willing to accept legal custody. As summarized above, the trial court heard testimony that K.S. had a conviction for disorderly conduct which she had not disclosed and admitted in a recorded phone call with her incarcerated boyfriend that she had lied under

14.

oath regarding her plans to remain in contact with him. The record reflects that the agency investigated K.S.'s living situation and properly determined that she was not suitable for numerous reasons. Appellant father's second assignment of error is not well-taken.

{¶ 32} In support of his third assignment of error, father asserts that the trial court erred by granting permanent custody to LCCS when the children had not been in the custody of the agency for 12 of the previous 22 months at the time the agency filed for permanent custody. Father argues that by filing its motion for permanent custody in August 2014, the agency interrupted father's and mother's opportunity to complete their case plan services, which had not been assigned until January 2014.

{¶ 33} LCCS filed its motion for permanent custody of C.S. and C.K. on August 13, 2014, pursuant to R.C. 2151.414(B)(1)(a), which permits such a motion to be filed where the child has not been in the custody of a children services agency for more than 12 months if the trial court determines that the child cannot or should not be placed with the parents within a reasonable period of time based on the factors set forth in R.C. 2151.414(E)(1-16). The trial court must also find that it is in the best interest of the child for permanent custody to be granted to the children services agency.

{¶ 34} Father correctly states that C.S. and C.K. had not been in the temporary custody of LCCS for 12 months at the time the agency filed the permanent custody motion. However, the record reflects that, pursuant to R.C. 2151.414(B)(1)(a), the trial court considered and applied several of the factors set forth in R.C. 2151.414(E).

15.

Specifically, the trial court herein found pursuant to subsection (E)(1) that the parents had failed continuously and repeatedly to utilize the numerous medical, psychological and other social and rehabilitative services and resources made available to them to remedy the conditions that caused the children to be removed from the home. The trial court also found, pursuant to subsection (E)(2), that both parents suffered from chronic mental or emotional illness that make the parents unable to provide an adequate permanent home for the children at the present time or within one year after the hearing. Further, the trial court found, pursuant to subsection (E)(4), that the parents had demonstrated a lack of commitment to the children by failing to regularly support, visit or communicate with them when able to do so. Finally, the trial court found, pursuant to subsection (E)(12), that father was incarcerated at the time of the hearing and would not be available to care for the children for at least 18 months.

{¶ 35} Based on the foregoing, we find that the trial court did not err by granting permanent custody to LCCS when the children had not been in the agency's custody for 12 months at the time the permanent custody motion was filed. Accordingly, father's third assignment of error is not well-taken.

{¶ 36} In support of her third assignment of error, mother asserts that the trial court's decision to terminate her parental rights was not supported by clear and convincing evidence.

{¶ 37} In granting a motion for permanent custody, the trial court must find that one or more of the conditions listed in R.C. 2151.414(E) exist as to each of the child's

16.

parents.  If, after considering all relevant evidence, the court determines by clear and convincing evidence that one or more of the conditions exists, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent.  R.C. 2151.414(B)(1).  Further, pursuant to R.C. 2151.414(D), a juvenile court must consider the best interest of the child by examining factors relevant to the case including, but not limited to, those set forth in paragraphs 1-5 of subsection (D).  Only if these findings are supported by clear and convincing evidence can a juvenile court terminate the rights of a natural parent and award permanent custody of a child to a children services agency.  *In re William S.*, 75 Ohio St.3d 95, 661 N.E.2d 738 (1996).  Clear and convincing evidence is that which is sufficient to produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established.  *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

{¶ 38} Our review of the record shows that the trial court considered all of the relevant factors under R.C. 2151.414.  LCCS presented evidence that mother had not completed her case plan services sufficiently to remedy the issues that caused the children to be removed from the home.  Mother failed to complete the domestic violence program and did not consistently maintain her mental health despite case plan services.  She testified that there were times she slept 15 hours a day and had tried to commit suicide as recently as September 2014.  Further, mother did not take advantage of the

17.

services provided in order to visit her children, missing nearly half of the scheduled visitations despite the agency providing her with bus tickets from Summit County.

{¶ 39} Based on the foregoing, we find that the trial court's decision granting permanent custody of C.S. and C.K. to the agency was supported by clear and convincing evidence. Accordingly, mother's third assignment of error is not well-taken.

{¶ 40} Upon consideration whereof, the judgment of the Lucas County Court of Common Pleas, Juvenile Division, as to appellant father and appellant mother is affirmed. Costs of this appeal are assessed to appellants pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.     _____
                                       JUDGE

Arlene Singer, J.    

                                       _____

Thomas J. Osowik, J.                              JUDGE
CONCUR.

                                       _____
                                       JUDGE